Nicholas M. Pette, J.
This is an application by the father and guardian ad litem of Myra Cohn, the infant herein, for an order to withdraw from the City Treasurer all the funds deposited in his office to the credit of the infant in this action, for the purpose of applying the same towards the purchase of a violin made by Laurentius Storiani of Cremona, Italy, in 1797.
The infant, now 18 years of age, who is a music major at Queens College, New York, and who it is alleged has an outstanding talent, is desirous of becoming a professional violinist, and it is claimed that this expensive instrument is the proper violin for the practicing and developing of her talent in her chosen profession. She joins in the application, and her violin teacher, Fritz Rikko, who alleges that he teaches at the Julliard School of Music, New York, in an accompanying affidavit, states that the instrument the infant desires to purchase is the proper and correct instrument for her to use and that it is necessary in the development of her career.
The courts are zealous in conserving funds deposited for infants, and, in the exercise of sound discretion, unless a genuine and clear compelling necessity is satisfactorily shown, applications of this kind are invariably denied.
After careful consideration of the paper submitted on this application, the court has been unable to find sufficient facts alleged from which it could determine that a clear case of pressing and compelling necessity exists to warrant the granting of this application.
The court takes pride in being a devotee of the fine arts, and recognizes that “Music is the Noblest of the Arts”. It has a sincere admiration for students of the arts, and most earnestly commends the spirit and fine aspirations of the infant herein to attain success in her chosen field and certainly wishes her every possible success therein.
“Music expresses feeling and thought without language ” and has been said to be below and before speech, and is above and beyond words. Before man found a name for any thought or thing, he had hopes and fears and passions, and these were all rudely expressed in tones. It is recorded, and no one can gainsay, that music is a power and has influenced humanity with dynamic force in politics, religion, peace and war. The course of history has been varied largely by the instrumentality of three great musical compositions: the Lutheran Chorale, “ Bin feste Burg ”, the “ Ca ira ” and the “ Marseillaise ”. In our own era and among our own people the depth of feeling stirred by the “ Star Spangled Banner ”, to mention but one, must be very evident.
*404 The performer, not the instrument he uses, is largely responsible for the quality, charm and perfection of the musical notes he produces. True, a Stradivari, a Guarnieri, an Amati, Maggini, da Salo, Bodiani, Peregrino, or other ancient violin, in the hands of an accomplished musician will afford a tone quality consonant with the ability and technique of the performer which may not be obtained from a lesser instrument.
Genius takes care of itself, but the discovery and development of talent is too often undervalued or forgotten. Persons of extraordinary talent are most frequently born of commonplace parents and bred in schools of adversity, without benefit of books and masters. Their talent is not acquired in institutions nor manufactured; it is inherent and but awaits to seize the opportunity to make itself known and felt upon the consciousness of humanity, and in those unique instances recorded by history, to leave everlasting impressions upon our civilization.
A genuine talent contrives to make its own progressive development, and one truth about it is very evident. It is not to be pampered by convenient shortcuts and instrumentations calculated to ease and lighten the efforts and endeavors when talent itself must develop in order to achieve the goal of perfection for which it strives. There can be no such thing as a lazy talent, since talent is an endowment energized by the brain and soul of its possessor.
The story is told of Nicolo Paganini, the virtuoso in Excelsis, the greatest violinist the world has even known, said to have been imprisoned for a crime which it was later established he had never committed. While confined in jail, due to the atmospheric conditions prevailing in his dungeon, all of the strings of his violin were caused to break, with the exception of the “ G ” string, which, consisting of a gut and some metal, was unimpaired. Left thus with but a single string on which to perform while in.prison, by his constant, assiduous practice and enduring patience, he performed on the disabled instrument and became the greatest “ G ” string violinist of all time, able to produce the soul inspiring music and unique technique that placed him at the top of violinists.
It is noteworthy that such famous violinists as the immortal Beethoven, Mozart, Haydn and Handel, who were also eminent composers, did not have the means to acquire violins of the famous makers, Amati, Stradivari and Guarnieri, until after they had developed their talent and were acclaimed in the world of music. And during our own modern times, it is said that Jascha Heifetz, the renowned violinist, only acquired his Stradivari as a gift from a music lover that was impressed *405 by the great artistic performance of Heifetz on the violin. Paganini also is said to have acquired his Guarnieri del Gesú as a gift from the wealthy Frenchman, M. Livoron, an amateur violinist, who had loaned the instrument to Paganini and after hearing him play on the instrument refused to take it back, saying: “ I cannot now profane it again. Keep it, my dear Paganini, and look upon it as a souvenir. ’ ’ And the great composer, Passini, having composed a very intricate and tricky piece of music, feeling that it could not be done, offered to give Paganini a Stradivari if he could play the music by sight without practice. Paganini looked at the composition and with a shrug of the shoulders said: “It is easy ” and rendered the composition by sight with such masterful execution as to surpass the composer’s greatest expectations. Paganini later pawned the Stradivari to finance a trip to Leghorn “ for pleasure ’ ’.
The papers before the court show that the infant has already purchased the Storiani violin and paid $1,000 on account of the purchase price and that she is being allowed $200 in trade for her Lagetto violin, thereby leaving a balance of $1,300 to be paid to complete the purchase. The Lagetto violin is acknowledged to be a very fine instrument according to all reports, and the court is unable to see why that instrument cannot serve to enable this infant to practice and develop her talent. Perhaps the purchase by said infant was ill advised, if she depended upon the granting of this application to complete the same. As a minor she can, of course, rescind such purchase, if such be the fact, on the ground that said purchase was not a necessity.
If this infant has such an outstanding talent for the violin, who can measure that talent or gainsay that she cannot adapt her Lagetto, or a lesser instrument, in the practice and development of such talent. Talent is said to be born in a person and those possessing an inherent talent have surmounted more serious difficulties than the use of a Lagetto in order to practice and develop their talent, as Paganini so concretely demonstrated with his single string instrument in prison.
All the foregoing references to Paganini and the other great musicians, are intended here solely as a source of inspiration to the infant herein, with the assurance that if she has such outstanding talent as professed, she also may develop that talent to its limitless zenith.
It has been said that every one of the violinists who played with the orchestras conducted by the late famous conductor, Arturo Toscanini, was an accomplished professional violinist of the highest type, who was capable of and had achieved recog *406 nition for Ms talent as a distinguished soloist. Yet, none of these was able to own an expensive instrument to practice on before he reached his goal, and but few after that had the means of acquiring more than very good violins. They depended on their inherent talent more than their instruments to develop into accomplished professional violimsts.
It is common knowledge that people who can barely afford it but nevertheless do own Fords, covet Cadillacs, and although both cars perform the same basic function and there is no actual necessity for it, many must satisfy their ego and eventually do acquire Cadillacs, even though their finances be strained to the limit thereby. There is much wisdom in the old adage: “First acquire wealth, and then luxury ”. Of course, in a proper case, compelling necessity may logically indicate that the acquisition and use of an expensive violin will constitute the instrumentality immediately necessary to give opportunity of expression to a developed talent. However, in the case here, tMs court does not find any such compelling need to warrant the withdrawal of all the infant’s funds for such a purpose. Thrift and precaution dictate that the proposed expenditure should not be made at this time, and that until such compelling necessity is genuinely established, the court, in good conscience, should not sanction the proposed withdrawal. Precaution must not be influenced by mere convenience, and desire certainly cannot be substituted for necessity when the court is asked to exhaust funds of an infant, earmarked for her benefit and interest and entrusted to the discreet control of the court during the infant’s minority.
On the papers submitted, this application is denied.